Frank Fallica et al., Individually and as Members of the Board of Fire Commissioners of the Holtsville Fire District, Appellants, v Town of Brookhaven et al., Respondents.

Second Department, August 6, 1979

580

### APPEARANCES OF COUNSEL

*Frederic Block (Joel Markowitz* of counsel), for appellants.

*Joseph R. Mulé, Town Attorney (Benjamin L. Herzweig* of counsel), for respondents.

### OPINION OF THE COURT

SHAPIRO, J.

In the judgment appealed from, Special Term made the following determinations:

"ORDERED, ADJUDGED and DECREED that the Internal Revenue Service Center located in Holtsville, New York, which is owned by the Town of Brookhaven and leased to the United States of America, is exempt from real property taxation, exempt from taxes levied by the Holtsville Fire District, exempt from special ad valorem levies and special assessments, pursuant to Real Property Tax Law Section 406(1), and it is further

"ORDERED, ADJUDGED and DECREED that the Holtsville Fire District is obligated to furnish fire protection service to the Internal Revenue Service Center, and it is further

"ORDERED, ADJUDGED and DECREED that the first cause of action in plaintiffs' complaint which alleges that the Internal

Revenue Service Center is not exempt from taxation is dismissed in its entirety upon the grounds that it fails to state facts sufficient to constitute a cause of action, and that defendants have an affirmative defense founded on documentary evidence, and it is further

"ORDERED, ADJUDGED and DECREED that the second cause of action wherein plaintiffs allege that under the authority of Chapter 972 of the Laws of 1970 as well as the lease between the Town of Brookhaven and the United States of America concerning the Internal Revenue Service Center, the Holtsville Fire District is entitled to receive money payments in lieu of taxes, assessments and other charges, for the provision of fire protection services rendered to the Center, is dismissed in its entirety on the grounds that it fails to state facts sufficient to constitute a cause of action and that the defendants have an affirmative defense founded on documentary evidence, and it is further

"ORDERED, ADJUDGED and DECREED that the third cause of action wherein plaintiffs allege that the Town of Brookhaven has been unjustly enriched by the receipt of fire protection services provided to the Internal Revenue Service Center is dismissed in its entirety on the grounds that it fails to state facts sufficient to constitute a cause of action and that the defendants have an affirmative defense based on documentary evidence."

### THE ISSUE

Section 181 of the Town Law sets forth how a fire district, such as the one involved here, is to be funded. Subdivision 1 of section 181 provides, in part: "After the annual budget has been adopted by the town board and a certified copy presented to the board of supervisors of the county in which the town is situated, the board of supervisors shall assess and levy upon the taxable real property within the several fire districts the amounts to be raised by tax for the purposes of the respective districts as specified in such annual budget and shall cause the amount so assessed and levied to be collected, in the same manner and at the same time and by the same officers as town taxes are assessed, levied and collected."

The issue here is whether the land in question, leased by the town to the Federal Government for use as an Internal Revenue Center, is tax exempt because it is "held for a public use" under the provisions of subdivision 1 of section 406 of the

Real Property Tax Law so that no tax may be assessed or levied thereon for the funding of the fire district in which it is located. We hold that in this case the land is not "held for a public use" and that, accordingly, it may be charged with its pro rata share for the maintenance of the fire district. Therefore the judgment appealed from should be modified as hereinafter stated.

### THE FACTS

On May 19, 1970, pursuant to the home rule request of the Town of Brookhaven, the State Legislature adopted chapter 972 of the Laws of 1970 which authorized the town to acquire "by purchase, gift or dedication or by condemnation, land * * * in the town, as the site for an office building and related facilities primarily suitable for the purpose of providing space for the permanent activities, facilities and employees of the United States of America, acting by or through any authorized agency * * * [and] own, construct, reconstruct, alter, improve and add to, an office building and related facilities suitable for such purpose and use on such site" (L 1970, ch 972, § 2, subds [1], [2]).

Pursuant to that authority the town acquired 42 acres of land in one of its subdivisions, within the Holtsville Fire District, and leased it to the United States for an Internal Revenue Service Center (IRS Center) consisting of five buildings having an "outside to outside dimension gross area of 520,637" square feet. The IRS Center processes tax returns for approximately 50 million taxpayers.

The enabling act (L 1970, ch 972, § 5) provided that the town was: "authorized and empowered to make request of the United States of America for and on behalf of the town *and any political subdivisions* * * * in which the land owned by the town and upon which the town owned federal office building is situate, for the payment of such sums in lieu of taxes, assessments or charges which otherwise might be levied upon, assessed or charged against such land and building, as the United States of America may agree to pay; and to enter into agreements with the United States in the name of the town for the performance of the services by the town *and such political subdivisions* for the benefit of such federal office building and for the payment by the United States to the town * * * of sums in lieu of such taxes, assessments or charges. Nothing aforesaid shall preclude the town from mak-

ing such request in its negotiations with the United States of America and providing for such payments in the lease * * * but in such case, such payments shall be considered and treated separate and apart from the amounts of lease payments. Any agreement entered into with respect to such payments *shall contain the names of the political subdivisions with respect to which it is consummated, and a statement of the proportionate share of the payment by the United States of America to which each such political subdivision shall be entitled. The town board shall * * * pay over such proportionate share or any part thereof upon receipt.*" (Emphasis supplied.)

■ In its lease with the United States, the town agreed to provide "public and/or volunteer fire protection". Since the complex was contained in the fire district of Holtsville (a subdivision of the town) it is apparent that even without such a provision, the fire fighting services would have to be rendered by the Board of Fire Commissioners of the Holtsville Fire District.

The United States Government took possession pursuant to a 20-year lease beginning July 1, 1972 at an annual rent of $3,065,568.25. The lease did *not* provide that the United States of America was to make payment "in lieu of taxes, assessments or charges which otherwise might be levied upon, assessed or charged against such land and building"—nor did it contain a provision that "any political subdivision" of the town was to receive payment (either directly from the lessee or indirectly from the lessor town) for the "performance of services by the * * * political subdivision for the benefit of such federal office building".

The lease contained "tax escalation" provisions to the effect that at the end of each five-year interval the rent "will be adjusted to provide for increases or decreases in general real estate taxes", and that the tax adjustment "shall be 100% of the increase or decrease of the total taxes". It then provided that "[p]roof of the amount of tax and evidence of payment will be furnished by the lessor". This was despite the fact that from its very inception the site, assessed by the town at $2,500,000, was listed on the town records as tax exempt. Such exemption was based on the town's position that the site was "held for a public use" within the meaning of subdivision 1 of section 406 of the Real Property Tax Law, which provides that "[r]eal property owned by a municipal corporation within its

corporate limits held for a public use * * * shall be exempt from taxation and exempt from special ad valorem levies and special assessments".

In 1975, the lease was amended, *inter alia,* by deletion of the tax escalation provisions and by reduction of the annual rent to $2,100,000.

## THE FUNDING OF THE HOLTSVILLE FIRE DISTRICT[1]

The Holtsville Fire District is funded by taxes upon taxable real property located in the fire district in accordance with the provisions of subdivision 1 of section 181 of the Town Law. That statute provides that the board of commissioners of each fire district is to file with the town in which the fire district is located detailed estimates of the revenues to be received and the expenditures to be made during the following fiscal year, and that after the annual budget has been adopted by the

---

1. It is important to emphasize the difference between a fire district, a fire protection district and a fire alarm district. The latter two have no existence separate and apart from a town itself. They are merely conduits through which the municipality provides fire protection as a municipal service to the inhabitants and property of a particular district. With respect to a fire protection district, once a district is established, the town board can contract with, "any city, village, fire district or incorporated fire company * * * for the furnishing of fire protection in such district" (Town Law, § 184, subd 1). A fire alarm district works under the same concept as a fire protection district in that once the town board has established a district, the board must provide for the furnishing of fire protection. The board may discharge this obligation in the same manner as it would with respect to a fire protection district, i.e., by contract (Town Law, § 183).

A fire district, once it is established, is a separate entity from the town board. Subdivision 6 of section 174 of the Town Law states: "A fire district is a political subdivision of the state and a district corporation within the meaning of section three of the general corporation law. The officers and employees of a fire district, including the paid and volunteer members of the fire department thereof, are officers and employees of such fire district and are not officers or employees of any other political subdivision."

In lieu of the town board, a fire district has five commissioners, all of whom are elected and who serve without compensation. The powers which the fire district commissioners possess are enumerated in section 176 of the Town Law. The board of fire commissioners may contract to provide fire protection services outside the district (§ 176, subd 16); may acquire by gift, purchase, lease or condemnation, real property required for fire district purposes (§ 176, subd 14); and may under certain conditions dispose of real or personal property no longer needed for direct purposes (§ 176, subd 23). The fire commissioners have the power to award all contracts for public work and all purchase contracts to the lowest responsible bidder (§ 176, subd 23-a). The commissioners have the right to the exclusive control of fire district property and can, at district expense, contract for insurance indemnifying the district and its members from loss arising from injuries to persons or property through the maintenance of the fire district (§ 176, subd 19).

town, "the board of supervisors of the county in which the town is situated * * * shall assess and levy upon the taxable real property within the several fire districts the amounts to be raised by tax for the purposes of the respective districts * * * and shall cause the amount so assessed and levied to be collected, in the same manner and at the same time * * * as town taxes are assessed, levied and collected. When such taxes are collected, the amount thereof shall be paid to the supervisor of the town and by him immediately paid to the treasurer of the respective fire districts." In this action the Holtsville Fire District submitted documentation to the effect that between 1973 and 1977 its budget increased from $104,540 to $216,597. Although it submitted no documentary evidence as to the specific costs of fire protection for the IRS Center, implicit in its complaint is the allegation that this was a substantial cause of its increased expenses.

### THE COMPLAINT

Plaintiffs constitute the entirety of the membership of the Board of Fire Commissioners of the Holtsville Fire District and they sued in such official capacity. They also sued in their individual capacities, as "owners of taxable real property located within the confines of the Holtsville Fire District * * * on behalf of themselves and all others similarly situated." The complaint contains four causes of action alleging essentially: (1) that the property is not tax exempt and that the town owes the fire district the sum of $256,700 (based on the year-by-year *ad valorem* levies for fire district purposes) pursuant to the assessment of the IRS Center at $2,500,000; (2) that the enabling act (L 1970, ch 972, § 5) required the town to collect payments from the United States for fire protection but that the town failed to do so and is therefore liable to the fire district in the sum of $256,700; (3) that the town has benefited from the fire district services that were furnished to the IRS Center, the reasonable value of which was $285,000; and (4) that if no payments are due to the fire district, the court should as "a matter of equity" relieve the fire district of the burden of furnishing its services "by declaring its rights in respect thereto and by fashioning appropriate remedies."

Defendants moved for judgment dismissing the complaint pursuant to CPLR 3211 (subd [a], pars 1, 7). Plaintiffs, in their opposing affirmation, requested that the motion be treated as one for summary judgment pursuant to CPLR 3211 (subd [c])

and that judgment be granted in their favor. Special Term granted summary judgment to defendants. The judgment provided, *inter alia,* that the premises were "exempt from real property taxation, exempt from taxes levied by the Holtsville Fire District, exempt for special ad valorem levies and special assessments, pursuant to Real Property Tax Law Section 406(1)". It further decreed that the fire district was obligated to furnish fire protection services to the Holtsville IRS Center.

### THE LAW

Since the Board of Fire Commissioners of the Holtsville Fire District was obligated by statute to furnish fire protection services to all property within the boundaries of the fire district (see 19 Opns St Comp, 1963, p 39; see, also, Town Law, § 170), whether taxable or tax exempt, the provisions in the lease relating to the furnishing of fire protection services were, in effect, surplusage. Thus, plaintiffs' contention that such lease provision per se created an obligation upon the town to see to it that the fire district received compensation lacks merit.

Nor can plaintiffs' contention that they were third-party beneficiaries of the provisions of the lease relating to "any political subdivisions * * * upon which the town owned federal office building is situate" (L 1970, ch 972, § 5) be sustained since there were no provisions in the lease which inured to their benefit. Section 5 of chapter 972 of the Laws of 1970 did no more than "authorize" and "empower" the town *"to make request"* of the United States for payments "in lieu of taxes, assessments or charges * * * *as the United States of America may agree to pay".* The statute left it entirely within the discretion of the town whether it *should* make such request and whether it should then insist that such request be granted on pain of termination of negotiations.

Nor is there merit to plaintiffs' contention that they were third-party beneficiaries of the tax escalation clause originally contained in the lease (but deleted in 1975) wherein the United States agreed to reimburse the town for increases in the real estate taxes levied upon the property. Such provisions were an anomaly, since payment of rent adjustments thereunder was dependent upon the town not only providing "[p]roof of the amount of tax" but also "evidence of payment" thereof. Since the town classified the property as tax exempt, there was no *tax* (although it could be hypothesized from the assess-

ment) and there certainly would be no "evidence of payment" available.

Plaintiffs further argue that since the rental payments necessarily include a component (although unstated) for fire protection, "the Town must be deemed to have received such payments on behalf of the Fire District under a constructive trust." Plaintiffs, in effect, argue that it was unfair for the town to receive the entirety of the rent when the fire district, a subsidiary but separate part of the town, was required (both by law and by the lease) to furnish free services to the tenant, i.e., that the town was enabled to have its *net* rental receipts equal to the *gross* rental by having the fire district furnish services without pay.

Judge CARDOZO stated, in *Beatty v Guggenheim Exploration Co.* (225 NY 380, 386): "A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee".

In *Latham v Father Devine* (299 NY 22, 27) Judge DESMOND stated: "A constructive trust will be erected whenever necessary to satisfy the demands of justice * * * [I]ts applicability is limited only by the inventiveness of men who find new ways to enrich themselves unjustly by grasping what should not belong to them" (quoted in *Simonds v Simonds,* 45 NY2d 233, 241).

In *McGrath v Hilding* (41 NY2d 625, 629), the court stated: "Enrichment alone will not suffice to invoke the remedial powers of a court of equity. Critical is that under the circumstances and as between the two parties to the transaction the enrichment be unjust. (Restatement, Restitution, § 1, Comments *a, c;* see, generally, 5 Scott, Trusts [3d ed], § 462.2.) Hence, whether there is unjust enrichment may not be determined from a limited inquiry confined to an isolated transaction. It must be a realistic determination based on a broad view of the human setting involved (cf. *Sinclair v Purdy,* 235 NY 245, 254, *supra; Janke v Janke,* 47 AD2d 445, 448, affd 39 NY2d 786)."

It is true that fire districts have always been obligated to provide fire protection to tax-exempt property (19 Opns St Comp, 1963, p 39) even though its owners of taxable property, by higher *ad valorem* taxes (since the number of taxpayers is

less), finance such free services to the tax-exempt property. But the difference here is that the owner, the town, is receiving a higher net rental because the property is free from expense to it of the fire protection which the property is receiving. Thus, the town is receiving more in its coffers *because* (by its ipse dixit of tax exemption) it created the very situation whereby the taxpayers of the fire district are to pay more.

■ However, although it is established that a municipality is subject to the equitable doctrine of estoppel (see, e.g., *Eden v Board of Trustees of State Univ. of N. Y.*, 49 AD2d 277), no authority has been called to our attention for imposing a constructive trust against one governmental entity for the benefit of another, and we deem it unnecessary to enter into this thicket in view of our conclusion that the property was in fact not tax exempt.

### WAS THE TOWN OWNED PROPERTY "HELD FOR A PUBLIC USE"?

#### THE EFFECT OF THE ENABLING ACT

The enabling act (L 1970, ch 972) is entitled "An Act relating to the acquisition of land and the construction thereon and financing of an office building for the primary use of the United States of America by the town of Brookhaven and authorizing the leasing of such office building to the United States of America". Section 1 is entitled "Legislative findings and declaration." The text of this section includes the following: "If a Federal office building project is constructed in a municipality in accordance with an integrated comprehensive and long-range plan for the physical and economic development of the municipality, it can promote and serve to attract, encourage and develop the entire area in such municipality by facilitating the provision of adequate parking facilities which can be used by persons living, working and shopping in the area, as well as by the federal employees, by incorporating existing or proposed arterial highways and controlled access roads for improved traffic movement and by assisting the town in planning and providing for parks, recreation areas and other facilities for the use of the residents of the town * * * In carrying out such purposes and in exercising the powers granted by this act, *the town shall be regarded as performing an essential governmental and town function*

*and these public purposes are hereby found and declared to be town purposes and town uses"* (emphasis supplied).

The defendants argue that this statute "expressed the legislative policy that in fulfilling the objectives contemplated in Section 1, the property * * * will be held for a public use [and] that based upon the legislative policy declared in Chapter 972, the noncontroverted governmental uses of the facility, as well as Section 406, subd 1 of the New York Real Property Tax Law, it is clear beyond dispute that the facility is held for a public use."

■ However, since section 1 of article IX of the New York State Constitution and subdivision 2 of section 64 of the Town Law permit a local government to acquire real property "by lease, purchase", or by condemnation only where it is "required for any public purpose", the legislative findings and declaration in the enabling statute were necessary to permit the town to acquire the property. But "public purpose" per subdivision 2 of section 64 of the Town Law is not necessarily synonymous with "public use" per subdivision 1 of section 406 of the Real Property Tax Law. The argument that they are one and the same was rejected in *Town of Harrison v County of Westchester* (13 NY2d 258, 265), where the court said:

"The argument is, in effect, that, since the Legislature has there been held empowered to authorize the condemnation of property for a 'public use' even though some of the property is to be leased to private parties, the same interpretation of the standard of 'public use' must necessarily be applied in determining the tax status of such property.

"While the argument may have superficial appeal, it cannot withstand analysis since the two situations are completely disparate as respects both the policy considerations and the issues involved. The policy considerations which prompt or move the Legislature to authorize the acquisition and operation of a project, or to sanction condemnation to bring it into being, may be altogether different from those affecting its decision as to whether the property so acquired or operated shall be free from tax. The Legislature may quite properly conclude that hangars for private parties are essential to the economy and in the public interest and that, unless a county or other public airport is permitted to provide such facilities, the use thereby afforded probably could not be made available or exist at all. But it by no means follows that the Legislature would conclude that the parties using the private hangars

should not bear their proper share of the tax burden, that the entire burden should be thrown on the residents and other taxpayers of the town. (Cf. *County of Herkimer v. Village of Herkimer,* 251 App. Div. 126, 127, affd. 279 N. Y. 560, *supra.)"*

The only legal method by which a town may acquire land by, *inter alia,* condemnation is that the real property be required for a public purpose, but that is only the beginning, not the end, of the inquiry as to whether the land is being devoted to a "public use" so that it is tax exempt under subdivision 1 of section 406 of the Real Property Tax Law.

In *Town of Harrison v County of Westchester (supra,* p 263) the court said: "Although what comprises 'a public use' within the meaning of the statute 'has never been defined with exactitude' and 'must necessarily depend upon the peculiar circumstances of each case', it has been said, and most appropriately, that 'Held for a public use, in this connection, means that the property should be occupied, employed, or availed of, by and for the benefit of the community at large, and implies a possession, occupation and enjoyment by the public, or by public agencies.' " The court held (p 263) that land owned by a municipality that is "employed in the actual operation of an airport for the general use of *its inhabitants* must be deemed to be 'held for a public use' " (emphasis supplied). By the use of the phrase "of its inhabitants" the court made it clear that by "community at large" it meant *the inhabitants of the municipality.*

In *Matter of County of Erie v Kerr* (49 AD2d 174, 180), the court held that the county-owned sports stadium, which had been leased to a private operating corporation, was devoted to a public use where the stadium was being "employed in furtherance of the exact purpose for which it was contemplated, i.e., to provide *the residents of Erie County* the benefit of a first-class recreational, sports and cultural facility" (emphasis supplied). Clearly, the presence of an important sports stadium was of particular benefit to the county's residents who otherwise would be required to travel a much greater distance to see sports events, and by having a local sports stadium there would be a greater likelihood of having a home team.

That principle was the basis of the decision in *Matter of Dubbs v Board of Assessment Review of County of Nassau* (81 Misc 2d 591), which held that the Nassau Coliseum constituted property held for a public use, and was therefore tax

exempt. The court said (p 600): "Certainly *the county's residents* are obtaining the full benefit for which the Coliseum was intended, to wit, the ability to view a wide range of sporting, cultural, recreational and other events which might not otherwise be available to them" (emphasis supplied).

By contrast, in *Erie County Water Auth. v County of Erie* (47 AD2d 17) the court held that certain property held by the water authority did not qualify for tax exemption because it was not employed for the proper purposes of the authority. The court stated (p 22) that "[t]o avoid loss of the exemptions, the use [of the publicly owned property] must be directly related *to the owner's purpose"*, i.e., that of the residents of the county.

The cases cited illustrate the principle that in order for municipally owned real property to be exempt from taxation because of its "public use", that use must be one that enhances the health, education, safety, or welfare of *the residents of the municipality.* Exemption from taxation is the price paid by the municipality for the assumption of a portion of the functions of the municipality, although such functions will be given a wide latitude (as, for example, to ease transportation to a cultural or sports event). However, increasing the tax burden on the *paying* taxpayers cannot be legally justified where the latter do not themselves obtain benefit from the use of the tax-exempt property. Thus, a building in the Town of Brookhaven, owned by the town and used to house one of its governmental agencies is held for a public use in that it facilitates the governmental tasks of the Town of Brookhaven. However, if the building were leased to another town (e.g., to be used for storage of school books or the records of the other town) it would not then serve the governmental needs of the Town of Brookhaven, any more than if it had been leased to a private corporation for the storage of its papers.

I see no difference, in principle, between the Town of Brookhaven's leasing of its property to the United States Government for an IRS Center and the town's leasing of its property to another town or to a private corporation. In all three situations the property is not being used for the particular benefit of the residents of the Town of Brookhaven.[2]

Although the United States is performing one of *its* govern-

---

2. The lease clearly shows that the premises were to be used by government employees only and that the general public was excluded, as shown by the provisions for fences, access limitations and alarms.

mental functions, i.e., processing tax returns, that is not a "governmental function" of the *town.* Indeed, the use of the property is no more related to the functions of the town or to the general welfare of its residents than if it had been rented to IBM. Therefore, the real property here is not tax exempt.

### WHO IS ENTITLED TO RELIEF?

The prayer for relief in the complaint essentially requests damages for the past years during which the property was listed as tax exempt. However, plaintiffs, in their capacity as members of the Board of Fire Commissioners of the Holtsville Fire District, were funded from taxes levied upon the taxable real property in the fire district. The fire district received sufficient funds through such taxation to support its operations. Thus they should not be permitted to recover in *their official capacity* since their budget has already been collected from other sources. Under such circumstances a recovery by them here would constitute an inappropriate windfall. Therefore, in their official capacity, the plaintiffs are not entitled to a money judgment.

However, in their status as taxpayers, plaintiffs are entitled to prevail on their demand, in essence, for a declaratory judgment that the property is not exempt from real property taxes, since it is not held for a "public use" as contemplated by subdivision 1 of section 406 of the Real Property Tax Law.

The judgment appealed from should therefore be modified by deleting the provisions declaring the property tax exempt and by granting the plaintiffs a judgment declaring that the property used and occupied as an IRS Center is not exempt from real property tax. As so modified, the judgment should be affirmed.

SUOZZI, J. P. (dissenting). The majority holds that land, together with the office building thereon, leased by the Town of Brookhaven to the Federal Government for use as an Internal Revenue Service Center, is not land "held for a public use" and, therefore, does not qualify for tax-exempt status under the provisions of subdivision 1 of section 406 of the Real Property Tax Law. I respectfully disagree.

The majority's holding is based on the principle that the concept of "public use" contained in section 1 of article IX of the New York Constitution and section 64 of the Town Law is not necessarily synonymous with the term "public use" con-

tained in subdivision 1 of section 406 of the Real Property Tax Law. Although this principle was indeed formulated by the Court of Appeals in *Town of Harrison v County of Westchester* (13 NY2d 258), it can only be properly understood in the precise factual context of that case.

In *Harrison,* the Westchester County Airport, constructed by the Federal Government on property purchased by the County of Westchester, was turned over to the county to be operated as a public airport. The county granted a lease to a private company for the operation of the entire airport as a public airport for the benefit of the public and the County of Westchester. One of two hangars involved was, after its construction, leased by the operating corporation to four companies for their private and exclusive use. These companies, in turn, sublet all or part of their areas to other companies, virtually all of which used the space to store and maintain their privately owned and used aircraft. The other hangar was leased by the operating corporation to a private company under a long-term agreement providing that the lessee or any sublessee would not use the hangar " 'for any purpose other than the storage and maintenance of private, corporate aircraft owned or operated * * * to provide transportation of its officers, employees and guests' " (p 261). Thereafter, the hangar was subleased for the full period to other private corporations. Pursuant to this agreement, this hangar, like the other hangar, was used almost exclusively to house and service aircraft belonging to these several corporations.

In holding that the two hangars were not exempt from taxation, the Court of Appeals stated (pp 263-264):

"Subdivision 1 of section 406 of the Real Property Tax Law provides that property owned by a municipal corporation within its corporate limits is exempt from taxation only if 'held for a public use'. Although what comprises 'a public use' within the meaning of the statute 'has never been defined with exactitude' and 'must necessarily depend upon the peculiar circumstances of each case', it has been said, and most appropriately, that 'Held for a public use, in this connection, means that the property should be occupied, employed, or availed of, by and for the benefit of the community at large, and implies a possession, occupation and enjoyment by the public, or by public agencies.' *(County of Herkimer v. Village of Herkimer,* 251 App. Div. 126, 128, affd. 279 N. Y. 560.) It follows, therefore, that those portions of the land owned by a

municipality which are employed in the actual operation of an airport for the general use of its inhabitants must be deemed to be 'held for a public use' and, accordingly, exempted from taxation. * * *

"[T]here can be no doubt that the courts below were correct in denying such tax exempt status to Hangars 'D' and 'E' for the reason that they are not being employed for a public use. As the trial court in this case aptly noted, both hangars are occupied by private corporations, either as lessees or sublessees, 'under long-term leases which insure to them complete dominion over the premises demised to them'. The hangars were not leased, nor are they utilized, for the purpose of providing storage or maintenance area for aircraft serving the general public or for any other purpose redounding to the benefit or advantage of the general community. On the contrary, they are being devoted to servicing the private aircraft of their corporate occupants and, indeed, the occupancy of Hangar 'E' is expressly limited by the operative leases to such a purpose. These two factors—the exclusive, long-term control of the premises by private corporations and the use of the premises by them solely for the storage and maintenance of aircraft serving only their own personnel and guests—warrant the conclusion that the hangars, and the land upon which they are located, are not 'held for a public use'. * * *

"Although the two hangars here involved may be employed by the county to obtain revenue, perhaps to help defray the expense of operating the public airport, it is clear that they are not being devoted to a public use so as to entitle them to tax exemption. As the high court of Pennsylvania declared in a case also involving the taxability of portions of a county airport, 'there is * * * no doubt but that property, even though owned by a body ordinarily tax exempt, is taxable if used by it for commercial purposes, or if rented to a lessee for a purely business enterprise and not a public use; this is true even though the rental or other proceeds from the property are devoted to the tax exempt activities of the lessor'. (Moon Twp. Appeal, 387 Pa., at p. 149.)"

It is within the particular factual context of Harrison that the Court of Appeals stated (p 265) that the "policy considerations which prompt or move the Legislature to authorize the acquisition and operation of a project, or to sanction condemnation to bring it into being, may be altogether different from

those affecting its decision as to whether the property so acquired or operated shall be free from tax."

In *Matter of Dubbs v Board of Assessment Review of County of Nassau* (81 Misc 2d 591), the County of Nassau, which owned the Nassau County Coliseum and the land upon which it was built, leased it to various private parties and entities for the purpose of booking various functions, e.g., athletic games, contests, spectacles, entertainment, trade shows and exhibitions, which were open to the public upon the payment of admission fees.

In determining whether the property was subject to tax exemption, the court stated (p 597): "[T]ax exemption does not, *ipso facto,* flow from the fact that the Legislature has declared that the purposes for which the Coliseum was built 'are for the benefit of the people of the county' and are to be deemed 'public purposes' (cf. *City of Newark v Essex County Bd. of Taxation,* 54 NJ 171) * * * tax exemption results only if the Coliseum is actually devoted to the public use within the meaning of subdivision 1 of section 406 of the Real Property Tax Law." The court also stated (p 595): "[A] solution to the controversy [was] to be found in a careful analysis of * * * *Harrison"*. The court then went on to contrast Hangars "D" and "E" in *Harrison,* which were controlled by private parties and employed solely for private purposes, from the Coliseum, where despite the existence of a private lessee, the facility provided all the residents of Nassau County the ability to view "a wide range of sporting, cultural, recreational and other events which might not otherwise be available to them and which are the very public purposes for which the Coliseum was authorized" *(Dubbs, supra,* p 600; see, also, *Matter of County of Erie v Kerr,* 49 AD2d 174; *Erie County Water Auth. v County of Erie,* 47 AD2d 17).

In upholding the tax-exempt status of the subject property, Special Term noted that if property used as a public airport and property used as a sports complex can be considered as being held for a public use, then property leased by the United States Government for an office building must also be considered tax exempt.

The majority does not argue with the holdings of *Harrison, Dubbs* and the *Erie* cases. Rather, the majority argues that the use here, as opposed to the sports stadium, does not benefit the community at large or the Town of Brookhaven. The majority goes on to state that while a governmental

function is being performed on this leased property, it is not a governmental function of the Town of Brookhaven and the use of the property "is no more related to the functions of the town or to the general welfare of its residents than if it had been rented to IBM".

Clearly, had the property in question been leased to IBM, it would not have been tax exempt pursuant to the holding of *Harrison*. However, the root of the fallacy in the majority's position lies in its failure to recognize that we are not dealing in this case with the lease of publicly owned property to a private person or entity. It is the latter situation where the holding of *Harrison* applies and inquiry as to who exactly is going to benefit from the use operated by the private lessee is both crucial and necessary.

In the case at bar, however, a completely different situation exists since the lease runs from one exempt organization to another exempt organization. A tax exemption has been recognized for property of one exempt organization which is leased to another especially in the case of property leased to the United States Government for defense purposes. Thus, in *City of Dayton v Haines* (169 Ohio St 191), the Supreme Court of Ohio held that land owned by the City of Dayton and leased to the United States as a reserve training area for the armed forces, was public property being used for a public purpose, within the meaning of the appropriate Ohio statute (see Ann. 54 ALR3d 402). I fail to see any distinction between *Haines*, where the Federal Government's defense operations were involved, and the case at bar, where the Federal Government's equally legitimate and vital taxing powers are involved. In both situations, it cannot be seriously disputed that a public purpose is being performed.

Accordingly, the judgment appealed from should be affirmed.

The majority's determination herein will have significant ramifications far beyond the instant appeal which the majority has neither expressly considered nor recognized in its opinion. The initial effect of this holding is that the Town of Brookhaven will be compelled to pay taxes to the plaintiff fire district and subsequently to all of the taxing authorities in which the subject property is located, such as the appropriate school district and the County of Suffolk. Since these tax payments will diminish the amount of rental income from the lease available to the town's general fund, a town-wide tax

increase upon the town's tax paying constituency is inevitable to make up for this deficit. As a consequence, the constituency of the fire and school districts, to whose benefit this determination purportedly inures, and who are also town taxpayers, will be required to contribute their share by additional town taxes.

Additionally, the majority's holding will have a significant impact on the present system of tax exemptions which are granted to land and improvements utilized by the various governmental entities (whether Federal, State or local) to provide governmental services and perform governmental functions which are not the appropriate obligations or responsibility of a particular taxing authority. On the basis of this determination, it may now be persuasively argued that if the Town of Brookhaven is not entitled to tax exemptions for this Federal IRS Center, then any taxing authority may deny similar exemption to any Federal, State or county facility which provides services or performs a function for a segment of the public outside of the limited geographical boundaries of that particular government entity.

LAZER, J. (dissenting). The Northern Regional Headquarters of the United States Internal Revenue Service in Holtsville in the Town of Brookhaven is located in a building complex constructed by the town and leased to the General Services Administration of the United States Government. The annual rental for the property, which comprises 42 acres with parking facilities for 2,755 automobiles and buildings which can accommodate up to 4,700 employees, is $2,100,000, and the term of the lease is 20 years. Although it has an assessed valuation of $2,500,000, since the tax year 1972-1973 the parcel has been listed on the town tax rolls as exempt from taxation. *Inter alia,* Special Term found the exemption valid and granted the town summary judgment declaring the property to be tax exempt and dismissing plaintiffs' declaratory judgment action for failure to state a cause of action. The majority of this court has voted to reverse portions of the judgment and to grant summary judgment to the plaintiffs on the ground that the tax exemption is unwarranted because the property is not held for a public use. Although I am in agreement with the majority that plaintiffs' various other contractual and statutory contentions lack merit, I depart on the issue of the exemption and join with Mr. Justice SUOZZI in voting to affirm. In my opinion, the property qualifies for

exemption from real estate taxes under subdivision 1 of section 406 of the Real Property Tax Law.

The enabling legislation which authorized the Town of Brookhaven to acquire the land, construct the facility, and lease it to the General Services Administration (L 1970, ch 972) was enacted pursuant to a home rule request. The following legislative findings appear in the statute:

"The location of a federal office building and related improvements within a municipality in which it is constructed create and greatly improve employment and business opportunities in the municipality and has a beneficial effect on the physical and economic development of the municipality. Experience has shown that ancillary private business and professional activities with significant potential for creating job opportunities for residents of a municipality are quickly attracted to an area which surrounds federal office buildings, that nearby residential development is accelerated and that the local real property value and revenues to the municipal government are correspondingly increased. In addition to serving the local public convenience in having federal services nearby, a federal office building is an important stablizing and growth factor in the economic vitality of the municipality in which it is located.

"If a federal office building project is constructed in a municipality in accordance with an integrated comprehensive and long-range plan for the physical and economic development of the municipality, it can promote and serve to attract, encourage and develop the entire area in such municipality by facilitating the provision of adequate parking facilities which can be used by persons living, working and shopping in the area, as well as by the federal employees, by incorporating existing or proposed arterial highways and controlled access roads for improved traffic movement and by assisting the town in planning and providing for parks, recreation areas and other facilities for the use of the residents of the town. * * *

"In order to accomplish the aforesaid public purposes, the town of Brookhaven should be empowered and authorized to acquire land and to construct thereon and own an office building primarily to provide space suitable for permanent activities of the Federal government and its employees together with related facilities, all of which will be of service to the town residents and the public at large. In carrying out such purposes and in exercising the powers granted by this

act, the town shall be regarded as performing an essential governmental and town function and these public purposes are hereby found and declared to be town purposes and town uses."

Subdivision 1 of section 406 of the Real Property Tax Law reads: "Real property owned by a municipal corporation within its corporate limits held for a public use, including real property held or used for cemetery purposes and all lots and plats therein conveyed by such municipal corporation as places for the burial of the dead, shall be exempt from taxation and exempt from special ad valorem levies and special assessments to the extent provided in section four hundred ninety of this chapter."

Although the findings in the quoted enabling legislation might seem dispositive of the current controversy, a "public purpose" for condemnation purposes is not *ipso facto* a public purpose for taxation exemption purposes *(Town of Harrison v County of Westchester,* 13 NY2d 258) and, therefore, adjudication is dependent on other criteria as well. "[W]hat comprises 'a public use' within the meaning of the statute 'has never been defined with exactitude' and 'must necessarily depend upon the particular circumstances of each case'" *(Town of Harrison v County of Westchester, supra,* p 263). The factors involved are often relative, not absolute, and the test may be one of degree *(County of Westchester v Town of Harrison,* 201 Misc 211). In *Town of Harrison (supra),* the Court of Appeals resorted to rather traditional language in declaring that the test of public use is whether the property is held for the benefit of "the community at large" and for the possession, occupancy or enjoyment by the public or by public agencies.

It is, of course, a fundamental rule of statutory construction that a statute is to be construed as a whole *(Long Is. Trust Co. v Porta Aluminum Corp.,* 44 AD2d 118) and that all parts thereof are to be construed together in order to determine legislative intent *(Gaden v Gaden,* 29 NY2d 80). Analysis of article 4 of the Real Property Tax Law in accordance with these tenets of construction reveals a consistent and intelligible legislative scheme composed of a progression from the broadest of exemptions based on ownership alone to a narrower exemption for municipal corporations based on ownership and public use and ultimately to the most restrictive exemptions which require that the use be exclusively for that purpose for which the entity claiming the exemption was

established. Thus, article 4 provides a tax exemption for property owned by: the United States, unless otherwise provided by the laws of the United States (§ 401, subd 2); the State of New York, unless otherwise provided in title 2 of article 5 of the Real Property Tax Law (§ 404); and school districts and boards of co-operative educational services (§ 408), without restriction as to use. The statute then exempts property belonging to a municipality within its corporate limits only if the property is "held for a public use" (§ 406, subd 1, the section in current controversy), and property owned by a special district if the land is within the district's boundaries and is "used exclusively for the purpose for which such district was established" (§ 410; see *People ex rel. Bd. of Comrs. for Improvements on Great Chazy Riv. v Sancomb,* 259 NY 1). Under section 412 the exempt status of property belonging to a public authority is such "as may be provided" in the Public Authorities Law which generally provides that such property is exempt to the extent that it is used in carrying out a corporate purpose (see *Erie County Water Auth. v County of Erie,* 47 AD2d 17). Section 416 provides that real property belonging to the United Nations is exempt if used exclusively for headquarters for carrying on its functions, and property belonging to foreign governments is exempt if used exclusively for offices or quarters for such government's representatives and their staffs (§ 418). Finally, under section 421, property belonging to a nonprofit organization is exempt to the extent the property is used exclusively for carrying out the purpose of the organization.

The majority's construction of "held for a public use" is so narrow that on the basis of its reasoning the exemption of municipal property would only be proper if the property were utilized primarily for the benefit of local inhabitants or for an exclusively municipal purpose. In essence, the majority is maintaining that despite the various gradations of use listed in article 4, the Legislature really meant "municipal" when it utilized the word "public" in subdivision 1 of section 406. The distinction in terms has a long statutory and jurisprudential history, however. Not only does the State Constitution refer to county, city, town and village purposes (see NY Const, art VIII, § 2), but the principle that a "public purpose" is broader in scope than a "municipal purpose" has been expressed in numerous cases (see, e.g., *Grimm v County of Rensselaer,* 4 NY2d 416; *Matter of Tobin v La Guardia,* 290 NY 119; *Hesse*

*v Rath,* 249 NY 436). At the same time that it finds the two terms indistinguishable, the majority seems to be attributing a very narrow construction to "municipal purpose" by tying the persons benefited directly to those who carry the tax burden. The Court of Appeals seemed more liberal in *Grimm v County of Rensselaer (supra),* where a community college was held to be operated for a county purpose despite the fact that two thirds of the student body resided outside of the county.

The qualification that municipal property is exempt only if used for "municipal purposes" is not unique and is to be found in other jurisdictions (see, e.g., *State ex rel. Harper v Mc-David,* 145 Fla 605; *Chadwick v City of Crawfordsville,* 216 Ind 399; *City of Norfolk v Board of Supervisors of Nansemond County,* 168 Va 606). The Legislature's failure to resort to such terminology in subdivision 1 of section 406 of the Real Property Tax Law is a clear reflection of its intent to permit tax exemption of municipal facilities utilized for the benefit of the broad public at large.

In former years, the judicially declared dichotomy between governmental and proprietary uses served as a convenient method of determining whether property was held for a public use (see, e.g., *Lloyd v City of New York,* 5 NY 369; *Bailey v Mayor,* 3 Hill 531; *Wilson & Co. v City of New York,* 73 NYS2d 206, affd 276 App Div 755, mot for lv to app den 276 App Div 894; *Matter of County of Westchester v Rizzardi,* 39 Misc 2d 820, affd 22 AD2d 808; *Clark v Sprague,* 113 App Div 645). The distinction, much criticized as archaic (cf. *County of Nassau v South Farmingdale Water Dist.,* 62 AD2d 380), now seems to have been abandoned in favor of other approaches under which revenue producing functions sponsored by commercial interests may be encompassed by the term "public use." In both *Matter of County of Erie v Kerr* (49 AD2d 174 [Rich Stadium]) and *Matter of Dubbs v Board of Assessment Review of County of Nassau* (81 Misc 2d 591 [Nassau Veterans Memorial Coliseum]), municipal facilities leased to private commercial interests for the showing of major league sporting contests, cultural events, public exhibitions and the like were declared to be held for public use despite the fact that the primary beneficiaries were the owners of major league sports franchises. Nevertheless, the rationale of *Erie* and *Dubbs* is not difficult to accept—the uses involved provided a means of meeting the recreational needs of the residents of the locality

whose facilities were utilized and thus the benefit flowed to those who carried the tax burden.

The majority declares further, however, that "increasing the tax burden on the *paying* taxpayers cannot be legally justified where the latter do not themselves obtain benefit from the use of the tax exempt property." To support this position, the majority cites to the situation which existed in this State in the 19th century when municipal property located outside the corporate limits was held exempt and not subject to taxation by the municipality in which it actually was located. Prior to an amendment in 1896 to the Tax Law which added the restriction that only municipal property "within its corporate limits" could be exempt (L 1896, ch 908), it was routinely ruled that municipal property owned outside corporate limits was entitled to an exemption, if held for a public purpose; the hardship on the taxpayers of the host municipality was deemed immaterial (see *People ex rel. Mayor of City of N. Y. v Board of Assessors of City of Brooklyn,* 111 NY 505; *City of Rochester v Town of Rush,* 80 NY 302). The 1896 amendment was intended to remedy an injustice, not present here, resulting from one municipality acquiring property outside its corporate limits and having it qualify for the statutory "public use" tax exemption when it was to be used *solely* for the benefit of its own taxpayers (see *People ex rel. City of Amsterdam v Hess,* 157 NY 42).

The pre-1896 analogy is hardly relevant to the national service provided by the Holtsville facility. By its holding, the majority has moved a considerable distance toward revival of the outmoded distinction between governmental and proprietary uses, albeit in a modified form which renders governmental uses proprietary and vice-versa. Thus the fact that the primary pecuniary benefit flows to private interests becomes insignificant if local recreations or cultural needs are met by use of the municipal facility. But from that position—for which *Erie* and *Dubbs* provide some authority—the majority has proceeded to its unsupported conclusion that where exemption from municipal taxation is concerned (1) the size of the public is a determinative factor, and (2) the greater the number of persons served in comparison to the number of local residents, the less "public" is the use. By this reasoning, a use is nongovernmental or proprietary if the municipality derives revenue from it and if the number of local people served by the use of a municipal facility is dwarfed by the

total number served. Therefore, even if the function performed is the basic governmental one of collection of the Nation's taxes, it is proprietary in nature, and the property in which the activity takes place cannot be exempted from taxation. There is no evidence that the Legislature ever intended its selection of the words "public use" in subdivision 1 of section 406 of the Real Property Tax Law to receive such a contorted construction.

Finally, the majority's conclusion is at variance with that enunciated by the Legislature with reference to the very facility at current issue. The acquisition, construction, and leasing of the Holtsville facility to the United States by the town was recognized by the Legislature "as performing an essential governmental and town function and these public purposes are hereby found and declared to be town purposes and town uses" (L 1970, ch 972). While this special legislative act "cannot in and of [itself] grant tax exemption, [it is], nonetheless, valid indicia of legislative intention" (see *Matter of County of Erie v Kerr,* 49 AD2d 174, 179, *supra)* and is entitled to respect since it relates to a situation of which the Legislature was aware (cf. *Matter of New York City Housing Auth. v Muller,* 270 NY 333).

I conclude that the use of the Holtsville property reflects the requisite "coalescence of public ownership and public use" (see *Jersey City v Jersey City Parking Auth.,* 138 NJ Super 442, 444, affd 71 NJ 492) within the meaning of subdivision 1 of section 406 and, therefore, the exemption was correct. Accordingly, I dissent and vote to affirm the judgment dismissing the complaint.

GULOTTA and COHALAN, JJ., concur with SHAPIRO, J.; SUOZZI, J. P., and LAZER, J., dissent and vote to affirm the judgment, with separate opinions; SUOZZI, J. P., concurs in the dissenting opinion of LAZER, J.

Judgment of the Supreme Court, Suffolk County, dated December 20, 1977, modified, on the law, by deleting the first and third decretal paragraphs thereof and substituting therefor a provision awarding plaintiffs, in their individual capacity, judgment to the extent of declaring that the subject property is not exempt from real property taxation, in accordance with the opinion herein. As so modified, judgment affirmed, without costs or disbursements.